### WABASH RY. CO. v. COMPTON.

(Circuit Court of Appeals, Sixth Circuit. July 26, 1909.)

No. 1,899.

1. APPEAL AND ERROR (§ 1022*)—REVIEW—FINDINGS OF COURT AND MASTER.

The determination of questions of fact on an intricate accounting by a master selected for his special fitness for the work, and affirmed by the Circuit Court, will not be overturned by the appellate court on anything less than a demonstration of plain mistake.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4015–4018; Dec. Dig. § 1022.*]

2. RAILROADS (§ 190*)—FORECLOSURE OF LIENS—REFERENCE FOR ACCOUNTING.

The action of a master stating an account to determine the net earnings apportionable to a part of a consolidated railroad system which was being operated by the company as a trustee with respect to the claim of a lienholder on such part, in adding to the net earnings apportioned to such part of the line by the railroad company on an actual mileage basis a further sum based on a constructive mileage, *held* justified by the evidence showing that such part of the line included valuable terminal property, and also that an actual mileage basis was, for other reasons stated in the opinion, unjust to the Ohio Division.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 623; Dec. Dig. § 190.*]

3. RAILROADS (§ 190*)—FORECLOSURE OF LIENS—REFERENCE FOR ACCOUNTING.
 Where, on an accounting to determine the net earnings of a line of
railroad operated as a part of a consolidated system for a period of
over 14 years, the report of the railroad company covering a short part
of such time was unsatisfactory and showed earnings far below those
of the period immediately following, the master was justified in reject-
ing such report and allowing earnings for the short time equal to the
average made during the entire time covered.
 [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 623; Dec.
Dig. § 190.*]

4. RAILROADS (§ 190*)—FORECLOSURE OF LIENS—REFERENCE FOR ACCOUNTING.
 The action of a master as confirmed by a Circuit Court, stating an
account to determine the net earnings of a line of railroad composing
a part of a consolidated system, during a period of years, in disallowing
certain credits and deductions, claimed by the railroad company, and in
approximating the amount of other items of debit and credit not clear-
ly shown by the evidence, affirmed.
 [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 623; Dec.
Dig. § 190.*]

Appeal from the Circuit Court of the United States for the North-
ern District of Ohio.

This is an appeal from the final decree of the Circuit Court for the North-
ern District of Ohio, in equity, upon the report of the special master on the
accounting directed by the Supreme Court under its mandate in the foreclo-
sure suit of Jessup et al. v. Wabash, St. Louis & Pacific Railway Company, sus-
taining the validity of the lien asserted by James Compton as against the so-
called "Ohio division" of the Wabash system, on account of his ownership of
a large block of the series of equipment bonds issued in the year 1862 by the
Toledo & Wabash Railway Company. Compton v. Jessup, 167 U. S. 1, 17 Sup.
Ct. 795, 42 L. Ed. 55.
 In the cases of Adelbert College of the Western Reserve University et al. v.
Wabash Railway Company et al. (No. 1,907), and Cyrus F. Pierson et al. v.
Same Defendant (No. 1,908), decided by this court at the same time with this
case (171 Fed. 805), both which cases involved claims upon other equipment
bonds of the same series as those held by Compton, a history is given of the
issue of that series of equipment bonds and of the prior litigation in respect
thereto, including the litigation over the Compton claim. The earlier history
of that litigation will also be found in the statement of facts accompanying the
opinion of this court in Compton v. Jessup, 68 Fed. 263, 15 C. C. A. 397, as well
as in the opinion of the Supreme Court in the same case (167 U. S. 1, 17 Sup.
Ct. 795, 42 L. Ed. 55). The Compton Case, as now presented, differs from the
cases of Pierson and the Adelbert College, just decided by this court, in this
important and controlling respect: By the decision of the Supreme Court of
May 10, 1897 (Compton v. Jessup, 167 U. S. 1, 17 Sup. Ct. 795, 42 L. Ed. 55),
it was determined: That complainant had by virtue of the decree of the Su-
preme Court of Ohio of May 1, 1888 (Compton v. Railway Co., 45 Ohio St.
592, 16 N. E. 110, 18 N. E. 380), a lien upon the Ohio division of the Wabash
system on account of his ownership of such equipment bonds; that such lien
was subject only to two prior underlying mortgages, both given before the con-
solidation of 1875, the one on September 8, 1853, by the Toledo & Illinois Rail-
road Company to the Farmers' Loan & Trust Company, trustee, to secure a
bond issue amounting to $900,000, and the other given on October 5, 1858, by
the Toledo & Wabash Railway Company to E. D. Morgan, trustee, to secure
an issue of bonds amounting to $1,000,000; that Compton's rights as such lien-
holder had been saved by the terms of the decree of the Circuit Court of the
United States for the Northern District of Ohio, of March 23, 1889, which
foreclosed the earlier mortgages, both divisional and otherwise, upon the Wa-
bash Road; and that the Wabash Company, which had taken over the railroad
property from the committee which had purchased it at the foreclosure sale,
"should be regarded as a party in possession under the express terms of the

order of sale, and as representing all parties in interest, including Compton"—and thus under a trust relation involving a duty to account for rents and profits until Compton's claim should be disposed of.

Under the mandate of the Supreme Court, this court made an order remanding the case to the Circuit Court, and providing: First, that upon the failure of the purchaser to pay Compton's claim in full, he was entitled to have that part of the Wabash Railroad extending from Toledo to the state line between Ohio and Indiana resold; second, that, in default of the payment by the purchaser of the amount due Compton upon his lien, a decree should be made directing the sale of the railroad covered by such lien, which was adjudged to attach to all the line owned by the Toledo & Wabash Railway Company at the time of the 1865 consolidation, together with all tracks, buildings, structures, and fixtures of every kind then or since erected thereon, but not to extend to any lands or structures thereon acquired by the successors in title of the Toledo & Wabash Railway Company after said consolidation; third, that before the sale a special master should be appointed to state the account of the annual net earnings of the entire so-called "Ohio division" and equipment from the time of the sale under the decree of March 23, 1889, down to the time of taking such account, over and above all operating expenses, taxes paid and cash paid, if any, in redemption of receiver's certificates, and other expenses properly chargeable against the railroad and property during that period, adding in the calculation of such expenses a reasonable rental or compensation for all property not covered by Compton's lien, but which contributed to the earnings, and such equipment as was used in the operation of the part of the railroad included in the Compton lien. The master was also directed to ascertain the amount due under the decree of March 23, 1889, on the two underlying divisional mortgages, with interest to the time of taking the account, and to deduct from said amounts the following items: First, net earnings calculated as above stated; second, the value of $75/900$ of all the cars, engines, and rolling stock and other equipment directed to be sold by said decree of March 23, 1889, as fixed therein, with interest upon said amount from the time of the sale under said decree down to the time of taking the account; third, the value of all additions of land to the railroad property in Ohio upon which Compton has a lien, to which additions said lien does not attach, but to which the liens of the prior divisional mortgages do attach, as of the date of the foreclosure decree of March 23, 1889, and to deduct the same, together with the valuation of any structures thereon, from the amounts found due on the mortgages. The decree of the Circuit Court further provided that, in the event of sale thereunder, the proceeds of such sale, after the payment of the expenses thereof and any costs or allowances which the court might fix as payable out of such proceeds, should be applied, first, to the balance of receiver's certificates, if any, properly chargeable to the Ohio property covered by Compton's lien and not discharged by the application of net earnings, as provided in said decree; next, to the payment of the amount due on the two underlying divisional mortgages, after deducting therefrom the net earnings as provided to be determined, and after making all other deductions above stated; and, next, to the payment of the amount due Compton on his lien.

The decree of the Circuit Court, which was entered October 5, 1897, appointed William H. H. Miller, of Indianapolis, Ind., "on account of his special fitness and experience in matters of accounting and all matters herein involved," special master to take and state the account provided by the decree and to make such sale as should be had thereunder. · The master's report, dated May 10, 1907, shows in considerable detail the results of his accounting from May 15, 1889, to June 30, 1903, by which the charges taking precedence of Compton's lien, as found by the master, aggregated $7,962,007, and the items applicable in Compton's favor against the above charges aggregating $7,238,188. The report so made up showed $723,819 still unpaid upon the underlying mortgages on June 30, 1903. The master further reported that in his opinion it would be fair to the railroad company to bring the accounting down to June 30, 1907, by charging the railroad company with an annual net earning of $149,949 (above engine and car rentals, taxes, and use of terminal property), that being the average shown by the accounting had up to June 30, 1903; and that, after making such charge, the balance due on the underlying mortgages on June 30, 1907, would be $21,542. Both parties excepted to the

master's report. The Circuit Court modified that report: First, by eliminating one of the items charged by the master against the railroad company on account of the value of rolling stock; second, by rejecting certain items of additions to terminal property found by the master; and, third, by allowing a credit to the claimant on account of engine rentals and repairs by striking out an item found to be duplicated, by having been previously credited to the railroad company in making up the net earnings account. The railroad company's exception to the master's adoption of an average net earning during the four years from June 30, 1903, to June 30, 1907, was disposed of by the action of the court in giving the railroad company the privilege of submitting actual accounts for that period. With the making of the modifications referred to, the account as stated by the Circuit Court and as brought down to June 30, 1907, showed the following results:

### Charges Taking Precedence of Compton's Lien.

| | | |
|---|---|---|
| Due on underlying mortgages on March 23, 1889...$2,811,611.00 | | |
| Interest at 6 per cent. to June 30, 1907.......... 3,083,927.00 | | $5,895,538.00 |
| | | |
| Allowed to the Wabash Railroad Company for rent and repair of engines to June 30, 1907, with interest thereon.............................$1,040,437.00 | | |
| Less deduction on account of duplicated item, $218,356, plus interest.......................... 485,759.00 | | 554,678.00 |
| | | |
| Allowed for car rentals and interest thereon to June 30, 1907.............................. | | 1,532,514.00 |
| Allowed for rent of real estate not covered by Compton's lien, to June 30, 1907........... | | 113,382.00 |
| Taxes to June 30, 1907, with interest thereon...... | | 835,048.00 |
| | | |
| Total charges taking precedence of Compton's lien ................................ | | $8,931,160.00 |

### Charges Against the Railroad Company.

| | | |
|---|---|---|
| Net earnings to June 30, 1907, plus average interest thereon ................................ | | $8,216,343.00 |
| Value of 75-900 of rolling stock sold under decree of March 23, 1889............................ | $172,277.00 | |
| 75-900 of payments on account of car trust purchase certificates, etc................................ | 131,618.00 | |
| Interest to June 30, 1907........................ | 330,483.00 | 634,378.00 |
| | | |
| Value of additions to real estate not covered by Compton's lien, as of March 23, 1889........... | 194,000.00 | |
| Plus interest to June 30, 1907..................... | 210,775.00 | 404,775.00 |
| | | |
| Total ................................ | | $9,255,496.00 |

By this accounting the underlying mortgages are decreed to have been overpaid on June 30, 1907, by $324,336. The decree also determined that there are no receiver's certificates outstanding entitled to any payment out of the proceeds of the sale of the property involved herein, and determined the amount of Compton's lien at $532,202.02, with interest at 6 per cent. per annum from October 5, 1897. The sale of the railroad property in Ohio was directed in default of payment of the last-named amount.

From this decree the railroad company alone has appealed.

Rush Taggart, for appellant.
Judson Harmon and John H. Doyle, for appellee.

Before LURTON and SEVERENS, Circuit Judges, and KNAPPEN, District Judge.

KNAPPEN, District Judge (after stating the facts as above). The master who conducted the accounting under consideration was selected for that position "on account of his special fitness and experience in matters of accounting and the matters herein involved." The record, including his report, shows that he performed the difficult task with ability and with painstaking care and fidelity. The opinion of the judge who passed upon the exceptions submitted in the Circuit Court shows that careful consideration was there given to the exceptions presented. So far as such exceptions are before this court, their subject-matter has passed the scrutiny of and been overruled by both the master and the presiding judge below. The matters sought to be reviewed here involve largely a determination of questions of fact, depending to a considerable extent upon the credit to be attached to the various witnesses seen and heard by the master. Under these circumstances, not only is the correctness of the decree in question presumed, but this court would not be justified in overturning the decision of these two courts upon anything less than a demonstration of plain mistake. Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 661; Crawford v. Neal, 144 U. S. 585, 596, 12 Sup. Ct. 759, 36 L. Ed. 552; Furrer v. Ferris, 145 U. S. 132, 12 Sup. Ct. 821, 36 L. Ed. 649; Davis v. Schwartz, 155 U. S. 631, 15 Sup. Ct. 237, 39 L. Ed. 289; Ohio Valley Bank v. Mack, 163 Fed. 155, 158, 89 C. C. A. 605.

There is no controversy here as to the amount of Compton's lien, nor as to the amount unpaid upon the underlying mortgages, except as that amount is affected by the application of the results of the accounting with reference to net earnings and the various charges and credits provided for by the decree. The exceptions argued here will be separately considered.

1. The most important of the exceptions urged here relates to the inclusion by the master, in the net earnings apportioned to the Ohio division, of the sum of $1,413,601, as an addition on account of constructive mileage as against actual mileage. To a proper understanding of the question raised by this exception, a brief statement of the conditions attending the accounting is necessary. The main line of the Wabash system during the period covered by the accounting extended from Toledo, Ohio, to St. Louis, Mo. (437 miles); from St. Louis to Kansas City (277 miles); from Toledo to Hannibal, Mo. (461 miles); and from Hannibal to Kansas City (199 miles). The distance from Toledo to the Ohio state line is but 76 miles. This so-called "Ohio division" was not in fact a division during the period covered by the accounting. It was simply operated as a part of the main line from Toledo to Kansas City, by way of St. Louis and Hannibal. In 1897, shortly after the appointment of the master, the railway books relating to the operation of the system up to that time were accidentally destroyed by fire. Neither before nor since the fire has any separate account been kept by the railroad company of the 76 miles known as the "Ohio division." The master began taking testimony in January, 1898. Obviously, the only definite information of value must come from the railroad company. After the taking of testimony had proceeded about four years, the master prepared, at

the request of counsel, a preliminary or tentative report giving his then impressions as to the general principles upon which accounting should be had as it then stood. A few months later, in reply to requests of counsel for explanation regarding parts of the preliminary report, a fuller report was prepared. Both reports were submitted to counsel for each party.

The railroad company presented to the master its statement of account of the net earnings of the 76 miles in question, according to the basis which the railroad company claimed should be adopted. This statement showed a credit of net earnings to the 76 miles in Ohio from March 23, 1889, to June 30, 1903, of $2,569,754.72, being the result of deducting from gross earnings, apportioned at $7,571,997.18, operating expenses apportioned at $5,002,242.46; the latter embracing the general classifications of maintenance of way and structures, maintenance of equipment, conducting transportation, and general expenses. In making up the gross earnings applicable to the 76 miles in question, the railroad company, after treating as local all earnings from one station to another in the Ohio division, apportioned freight and passenger earnings between points east of the Mississippi river and points in the Ohio division on an actual mileage basis. Mail earnings on each route extending over the Ohio division and express earnings east of the river were treated in the same way; but, as to freight earnings between points west of the river and points on the Ohio division, the same were first divided by giving to the part west of the river an arbitrary share larger, and usually from two to four times, than the actual mileage prorate, and then dividing the part so apportioned to the line east of the river (after deducting a substantial bridge charge) upon the basis of actual mileage. The testimony indicates that the passenger business to or from points west of the river was apportioned upon an actual mileage basis, after deducting a bridge charge. The freight earnings during the entire period covered by the accounting were greater than the combined mail, express, and passenger earnings, and much of the time at least three-fifths of the aggregate earnings of all kinds.

The master was of the opinion that the apportionment of earnings so made to the 76 miles of road in Ohio, upon an actual mileage basis, was unjust to that division for these reasons: First, that the railroad company, in violation of its duties as trustee, had taken steps in its own interest to divert traffic from the Ohio division over other routes secured by the Wabash Company, so that, according to its reports as made up while the traffic on the line generally had greatly increased, that on the 76 miles in question had not increased; the master stating in his report that it is "too plain for argument that since the rights of Compton accrued (and the railway company must be chargeable with knowledge of these rights from the time they accrued) by the use of the Eel River Detroit line, the Grand Trunk alliance, and more recently the Montpelier line and in various other ways, the natural traffic belonging to this line has been diverted." Second, that the arbitrary apportionment of constructive mileage to the portion of the road west of the river was wholly unjustified, at least to the extent to which it was practiced. Third, that in arriving at net earnings of

the Ohio division the railroad company had charged to operating expenses large amounts of betterments of every kind, and that the same policy had been followed with respect to rolling stock and engine renewals, to the serious prejudice of the Ohio division. And, fourth, that the Ohio division, by reason of its expensive and valuable terminals, was entitled to a greater proportion of earnings than indicated by the actual mileage.

Upon the question whether the apportionment of earnings to the 76 miles of road in Ohio was just to that division, or whether, on the other hand, an apportionment on a basis of a larger constructive mileage was justified, a large amount of testimony was taken. On the part of the railroad company there was presented a great deal of testimony to the effect that the Ohio division and its Toledo terminal originated no business, but that that portion of the road was merely an intermediate link in connecting business between the east and the west, and that an apportionment on the basis of actual mileage was as favorable as the Ohio division was entitled to. The master reports that some of the witnesses so testifying did not sustain themselves upon cross-examination. There was, on the other hand evidence of competent railway experts, whose testimony the master reports was credited by him, to the effect that the Ohio division was, largely by reason of its valuable terminals, entitled on business to or from points west of the Ohio line to an apportionment of constructive mileage greater than actual mileage; one witness of experience testifying that a proper apportionment would be double mileage on freight and actual mileage on passenger traffic, and another that 1½ actual mileage as to both freight and passenger business was justified. The master adopted the latter basis, viz., constructive mileage of 1½ to 1 with respect to all business to or from points west of Peru, Ind., which is about 150 miles from Toledo.

The accounts presented by the railroad company showed that upon this basis the gross earnings would be increased by $1,413,601, and this sum was accordingly adopted by the master, and added to the net earnings otherwise reported by the railroad company. The sum so added was in fact about 18.6 per cent. of the gross earnings of the Ohio division as reported by the railroad company, on the basis of which the net earnings of $2,569,755 had been arrived at.

The adoption of this constructive mileage is assailed by the railroad company as contrary to the clear weight of the testimony and as the result of palpable misapprehension. After giving careful consideration to the arguments of counsel for the railroad company, it is our opinion that the action of the master in adopting this constructive mileage apportionment is not subject to exception. There was competent testimony, believed by the master, sustaining the latter's conclusion that an apportionment of earnings to the 76 miles in Ohio on an actual mileage basis was unjust to that division. There was competent testimony to the effect that while the division of freights at the river was adopted many years ago as being a proper one, and while it may have been at the time of its adoption fairly just, it had long since ceased to be justified, at least to the extent to which the discrimination had been practiced. There was also competent proof that this discrimina-

tion greatly prejudiced the Ohio division in the apportionment of gross earnings, as also that such must have been the effect of charging betterments to operating expenses, and of the similar treatment of car and engine renewals. The master reports that he found himself unable, in view of the inability of the railroad company to present sufficiently definite reports, to ascertain the extent to which in these ways the Ohio division had been discriminated against. He did find, however, that the extent of such discrimination was substantial. The record amply sustains the propriety of adopting a constructive mileage apportionment in order to correct inequalities or injustice resulting from the use of actual mileage. It is clear that the evidence credited by the master justified him in increasing the apportionment of net earnings to the Ohio division, either by making an allowance for terminal expenses or by rejecting more or less items from the operating expenses, or by employing a constructive mileage. The adoption of constructive mileage was not arbitrary from the mere fact that it did not permit mathematical exactness. It is no more inexact than some of the figures the railroad company was compelled to rely on, and which the master reports in many respects unsatisfactory.

There is ample evidence sustaining the master's conclusion that the method employed was not unjust to the railroad company. It is urged, in support of the proposition that the Ohio division is not entitled to a constructive mileage apportionment, that the earnings of that division as reported by the railroad company are as great as the average per mile upon the entire system, that the terminal expenses at Toledo are no greater than borne on an average by all the lines of the system, and that the other lines east of the river are subject to the same low rates as the Ohio division.

It would appear that when the expenses incident to the Ohio division, by way of charges required to be made under accounting for the use of terminal property, taxes, and otherwise, are taken into account, the net earnings of the Ohio division, as apportioned by the Wabash Company, were below the average of the system; but, apart from this fact, the considerations mentioned are by no means conclusive upon the question of the propriety of a constructive mileage apportionment. The fact that other parts of the system are discriminated against affords no justification for discriminating, on this accounting, against the Ohio division. Moreover, the other arguments referred to fail to take into account the apparent fact not only that there is charged locally against the Ohio division large sums which benefit much more than the 76 miles of road in Ohio, but that about $1,000,000 worth of terminal property at Toledo is maintained by the Ohio division for the benefit not only of that division, but of a much larger proportion of the system, including car shops appraised at $650,000, of which the system generally has the benefit. The value of this terminal property at Toledo is shown to be about $1,500,000, about two-thirds of which is owned by the Ohio division. There is competent testimony that the value of the Toledo terminals is at least from .66 to .75 as much as the entire 76 miles of railroad in Ohio aside from the terminals. It is also urged that the railway experts, whose views of the propriety of employing constructive mileage apportionment were adopted by

the master, based their views of the propriety of such apportionment solely upon the alleged expensiveness of the Toledo terminals. It appears, however, that the witnesses upon whose testimony the master relied gave as reasons for such apportionment not only the expense of the Toledo terminals, but the cost of moving business over so short a line as compared with a longer one and in view of the low rates accepted. It is true that these witnesses apparently did not, in reaching their conclusion that a larger constructive mileage was justified, take into account the consideration of diversion of traffic, or perhaps, definitely, the arbitrary division of freight rates at the river, or excessive charges to operating expenses; but even apart from these last-named considerations, we should hesitate to say that the master's action could not be supported upon the considerations alone advanced by the railway experts. The fact that other considerations of apparent injustice to the Ohio division fortified the master in his conclusion that the adoption of a constructive mileage did not operate unjustly against the Wabash Company furnishes no reason for rejecting that conclusion.

In view of all these considerations, we have no hesitation in confirming the action of the master in adopting the constructive mileage apportionment.

2. The net earnings account as prepared by the master was made up by taking the item of $2,569,755 reported by the railroad company as net earnings for the 14-year period from July 1, 1889, to June 30, 1903, and adding the necessary amount to make a constructive mileage of $1\frac{1}{2}$ to 1, viz.. $1,413,601. The principal of the net earnings for the 14-year period thus aggregated $3,983,356. This took no account of the period from May 15, 1889, to June 30, 1889, which should be included in the accounting period. The master arrived at the net earnings for this period of $1\frac{1}{2}$ months by taking a proportionate share of the net earnings for the 14-year period. This proportionate share was $35,565, which, added to the other item, made the principal of net earnings to June 30, 1903, $4,018,921. The addition of this $35,-565 is excepted to as an arbitrary allowance and as a duplication of figures. Reference to the record convinces us that it is not a duplication; that is to say, it is not included in the figures given for the 14-year period. It is true that the railroad company presented figures for the month and one-half in question showing gross earnings of $51,-392.10 and operating expenses $46,292.57, leaving net earnings of $5,099.53. These figures showed gross earnings of only about $34,000 per month and net earnings of less than $3,500 per month during the $1\frac{1}{2}$-month period in question, as against gross earnings of nearly $50,000 per month and net earnings of over $22,000 per month for the fiscal year immediately following. The witness who presented the figures referred to was unable to explain this discrepancy or give any reason why there should have been so radical a change in the showing presented for the two periods. We think that under the testimony the master, for lack of more accurate data, was justified in adopting an average.

3. The railway company asked to be allowed, as against its liability for earnings of the Ohio division, a credit for $75/900$ of an item of

$233,444.27, representing railroad freight and switching charges belonging to the Wabash Company and collected by the Lake Erie Transportation Company from consignees and connecting carriers and not paid over by the transportation company to the Wabash Company, but absorbed in its own business. The Lake Erie Transportation Company was a corporation controlled by the Wabash Company; all of its stock being owned by that company. It is sought to justify this credit upon the proposition that the freight carried by the Lake Erie Transportation Company came over the Ohio division, and that the transportation company was maintained for the benefit of the Wabash Road, including the Ohio division. The master disposed of this claimed credit in the following language:

"As to the Lake Erie Transportation Company, the evidence shows that this is a subcorporation owned by the Wabash Railroad Company, defendant, that it was operated by defendant for its own profit, that its officers had full control and management thereof, and the master is unable to see why if the defendant allowed that company to become indebted, in the large sum which is now claimed, namely $233,444, for transportation charges not collected, the claimant, Compton, who has no lien upon the property of the Lake Erie Transportation Company and no interest in it and is not a creditor and has no connection therewith, should be charged with any part of such debt, nor why the defendant should be given an allowance on account thereof.

"For aught that appears in the evidence, the railroad company regarded the benefits accruing to it from the operation of this transportation company as a sufficient reason for allowing this debt to accumulate; and surely, in the absence of a clear showing that such accumulation was unavoidable, this trustee cannot under such circumstances put any part of the loss on the cestui que trust. If this enterprise had resulted in great profit, Compton would have been entitled to no part of those profits. This is illustrated by the fact that none of the profits of the Pacific Express Company or the American Refrigerator Transit Company are included in the accounting. * * * Why, then, should he share the loss, if it be a loss? Moreover, it is not shown that this debt is a total loss, or how much of it is uncollectible. * * * The claim on that account therefore, for an allowance of $75/900$, or $19,493, and interest, is disallowed as a claim in favor of the railroad."

We approve both the reasoning and the conclusion of the master.

4. In determining the amount which should be allowed the railroad company for rent and repair of engines upon the so-called "Ohio division," the master found that for the work of the line in Ohio there were required during the period covered by the accounting 12 passenger and freight engines and 5 switching engines, and that a fair annual rental for each of the 17 engines was $1,600, and a fair allowance for light running repairs was $1.50 per day, or $547.50 per year per engine. There was a conflict of testimony as to the extent of engine service required and its value, as well as of the cost of repairs. The railroad company contended that the engine service should be determined on the basis of the number of engine runs made, and that the value of the rental, as well as of the repairs, is much greater than found by the master. It is sufficient to say that the testimony presented purely a question of fact for the determination of the master, that there was testimony sustaining the conclusion reached by that officer, and that the record presented to us does not demonstrate that the master has made a mistake.

5. Car rentals.

The controversy here upon this subject is confined to the allowance made by the master on account of the rental of freight cars used upon the Ohio division. The railroad company claimed that the rate should be 7½ mills per car per mile from May 15, 1889, to November 1, 1894, and 6 mills from the latter date until June 30, 1903. These rates were claimed to be justified as being the exchange rates between railroads during the periods mentioned. There is no controversy over the number of cars or the mileage; the railroad company's figures therefor being taken by the master. The latter allowed 6½ mills per mile from May 15, 1889, to November 1, 1894, and 5½ mills per mile after that date, with a pro rata allowance for the excess paid by the railroad company on account of foreign cars above that received. The master found from the testimony that the 6-mill interchange rate provided a modicum of profit to the owner, and that no railroad company which was in position to own its cars could afford to pay the interchange rates mentioned. It was the view of the master, apparently concurred in by the judge of the Circuit Court, that the railroad company under its trust relation was not entitled to a profit, and that the rates allowed provided ample compensation for the use of the cars. Upon a careful consideration of the arguments presented upon both sides, in connection with the conclusion of the master and of the judge below, we are unable to say that a mistake prejudicial to the railroad company has been made in the allowance criticised.

6. The Circuit Court determined the amount of the compensation for the use by the Ohio division of real estate not covered by the Compton lien, but which contributed to income, at the sum of $113,-382. This allowance is criticised as too small, although we find no assignment of error directed to this subject. The specific criticism is that the court found the value of the real estate not covered by the Compton lien as $194,000, and that the interest upon this sum at 6 per cent. for 18 years 1½ months would be $210,975, instead of $113,-382 allowed by the decree. The master found the value of the property contributing to income, aside from parcels "C" and "C1," to be $104,261. The latter parcels were by the Circuit Court rejected from consideration. It is our understanding that the Circuit Court adopted the value found by the master, viz., $104,261, as the value of the property contributing to the earnings of the Ohio division, after eliminating parcels "C" and "C1." Interest on this last-named sum at 6 per cent. for 18 years 1½ months amounts to $113,382.60, as fixed in the decree.

7. By assignment No. 1 criticism is made upon the master's computation of net earnings, in that he did not state the account for each year nor compute interest thereon for each year, but computed interest upon the entire earnings for one-half the period. Obviously, the railroad company is not prejudiced by failure to state the net earnings yearly, unless the interest charge was increased by failure so to do. This assignment was not discussed in the main brief of appellant's counsel. In his reply brief, in answer to a discussion of appellee's counsel relating to a different exception, the master's addition of average interest is criticised as grossly unjust, from the alleged fact that the net earnings for the first half of the period average much less

than for the second half. The figures cited in support of this proposition are not controlling, for the reason that they are not the figures used by either the master or the Circuit Court in making up the aggregate net earnings on which interest is computed. During the first half of the accounting period, the average net annual earnings, as ascertained by the master and by the Circuit Court, appear to be slightly less than the average during the entire accounting period, and, if this item were alone to be taken into account, there would apparently be a slight discrimination against the railroad company.

In the master's report, however, attention is called to the difficulties connected with the ascertainment of net earnings, including the relation of the Toledo terminals, the division of rates at the river, what is a fair rental for the use of rolling stock, and what a fair charge for repairs. The master states that none of those questions "are settled by any decisive evidence," and that "the best that can be done is necessarily an approximation." Reference is also made to the uncertainty respecting taxes. The report then proceeds:

"In making such report the master has, as will be seen, made approximations based on averages, as the railway company employés did in much of their testimony. The master recently suggested that this was the best he could do, especially without the aid of an expert railway accountant, and, while the claimant assented to such method or to the employment of such accountant by the master, the railroad company objected to the method and also objected to the employment of an accountant by the master unless he was wholly paid by claimant and unless counsel for the railway company was permitted to cross-examine such accountant. As this would result in still further delay, the master submits his report based on approximations and averages believed to be fair. As much of the evidence is based upon similar approximations and averages mathematical accuracy is impossible."

The Circuit Court also said in its opinion, speaking of the net earnings assigned to the line in Ohio:

"These have been given as fully as the nature of the case permits. The apportionment must be largely an approximation."

The court also stated that "in the matter of taxes nothing but an approximation was possible," adding that in his opinion the master made a very large allowance in that respect, and that, if the amount of the allowance seriously affected the result which those figures brought, he should feel disposed to more narrowly scrutinize the items which go to make it up. The burden thus rests upon the railroad company to show affirmatively that it has been prejudiced by the adoption of averages.

We feel justified in disregarding the assignment in question in view of these findings of the master and of the Circuit Court, the fact that the subject in question was not discussed in the main brief of counsel, the further fact that the figures presented in the reply brief are not persuasive, and taking into account the comparatively small apparent difference between the average earnings for the 18-year period and the average for the 9-year period on the basis upon which interest has actually been computed in the accounting had, and the fact that it has not been pointed out to what extent this difference might be affected by other items as to which approximations have been made, including the uncertainty expressed by the master as to the correctness

of the net earnings accounts submitted by the railroad company by reason of the inclusion in operating expenses of amounts properly chargeable to betterments and renewals.

8. The order of October 5, 1897, appointing the master, provided that the amount of the net earnings of the Ohio division should be ascertained "over and above all operating expenses, taxes paid, and cash paid, if any, in redemption of receiver's certificates and other expenses properly chargeable against said railroad and property during such period." John McNulta was appointed, in September, 1888, receiver of the railroad property in the foreclosure proceedings instituted on behalf of the divisional mortgagees, which were consolidated with the then pending foreclosure proceedings on behalf of the Jessup and Knox consolidated mortgage. Upon the accounting the railroad company presented evidence: That the Wabash Railroad Company had paid liabilities of Receiver McNulta during the receivership in question from September, 1888, to April 30, 1889, aggregating $493,185.80; that it had received credits from that receivership amounting to $61,-811.19 and supplies amounting to $278,284.58. The amount of these payments thus exceeded the receipts by $153,090.03. The railroad company claims that $75/900 of this amount should be charged the Ohio division against net earnings, upon the contention that, while the evidence does not show any localizing of these payments against the Ohio division, the order appointing the master requires their allowance. The proposition that the operation of the Ohio division under Receiver McNulta did in fact show a loss equivalent to $75/900 of the sum above stated is claimed to be supported by a separate report relating to the Ohio division filed by Receiver McNulta covering his operation from September 1, 1888, to April 30, 1889. This report shows net earnings above operating expenses of $12,404.67. Against this sum is charged for car trust interest and expenses, $6,106.75 and eight months' proportion of taxes, $20,753.98, leaving a deficit for the period of $14,456.06, which is a trifle more than $75/900 of the $153,090.03 above referred to. The master expressed himself as incredulous that "this piece of property 76 miles long and a part of one of the oldest systems of railroads in the West, with very large terminals in the great and growing city of Toledo, has in a natural and just way been operated at a loss."

If, in our opinion, the order appointing the master contemplated that items of this kind should be taken into account, we should find it necessary to make a more critical examination of the record than the view which we take of the right to a credit of this nature requires. It is true that the purchaser of the property at the foreclosure sale was required to assume the liabilities of the receivership, but that was merely a part of the price required to be paid for the property. It is also true that the order appointing the master provided for taking account not only of "cash paid, if any, in redemption of receiver's certificates," but also "other expenses properly chargeable against said railroad and property during such period." There were, in fact, no receiver's certificates issued for this alleged receivership indebtedness. If this indebtedness is to be taken into account, it must be because it is an "expense properly chargeable against said railroad and property dur-

ing such period," which we think plainly means during the period covered by the accounting, viz., from March 23, 1889, to the time of stating the account.

In our opinion, it was not the intention of the order that indebtedness representing purely a deficit from operation under the receivership should be credited to the trustee in reduction of net earnings since the receivership. It is, moreover, to be noted that paragraph 5 of the order provides for the application of the proceeds of the sale, first, "to the balance of receiver's certificates, if any, properly chargeable," etc., without reference to any other class of receivership indebtedness not evidenced by certificates. Upon the ground stated we approve the action of the master and of the Circuit Court in rejecting this claimed credit.

9. The decree appointing the master provided for an ascertainment of "the value of $^{75}/_{900}$ of all cars, engines, rolling stock, and other equipment directed to be sold by said decree of March 23, 1889, and as fixed therein, with interest upon said amount from the date of the sale under said decree down to the time of taking the account." The foreclosure decree of March 23, 1889, under which the railroad property in question was sold, provided that the purchaser of the Ohio division should take by his purchase $^{75}/_{900}$ of the rolling stock and equipment belonging to the entire system, and that in case of controversy over the claims of junior lienholders "the proceeds and value of the said equipment shall be determined by the schedules of Mark Miller Martin and Joshua B. Barnes, witnesses, given in evidence before the special masters in this case," etc. It is conceded that the undivided equipment, so far as contained in the schedules referred to was appraised by Barnes and Martin at $2,067,334, $^{75}/_{900}$ of which is $172,277. The master, however, held that Compton was not bound by these terms of the foreclosure decree, determined that the rolling stock in question was actually worth $515,872, and, accordingly, added $^{75}/_{900}$ of this latter sum to the valuation charged against the railroad company.

The master also found that the purchaser under the foreclosure decree came into possession of further equipment purchased by the receivers, by way of car trust certificates and otherwise, amounting to $1,579,421, and charged against the railroad company $^{75}/_{900}$ of this last-named sum. The Circuit Court held that Compton was bound by the terms of the foreclosure decree as to the valuation of the property referred to therein, and accordingly rejected the $^{75}/_{900}$ of the item of $515,872. The item of $^{75}/_{900}$ of $1,579,421 referred to was, however, allowed by the Circuit Court as a charge against the railroad company. It is this item alone, with reference to the value of rolling stock to be charged against the railroad company, which is in controversy here. There are some matters connected with the consideration of this item which are not entirely clear to us, and, if we were to base our ultimate determination of this item upon the merits, we should be disposed to ask for further argument. In view, however, of our decision upon the other matters involved, a determination of the correctness of the item now under consideration is unnecessary, for this reason: The decree of the Circuit Court found the underlying mortgages overpaid on June

30, 1907, by $324,336. The item now under consideration, with interest thereon to that date, amounts to about $274,562, or nearly $50,-000 less than the amount by which the mortgages have been found to be overpaid.

Counsel for appellant earnestly urge that the general result of the accounting had shows its injustice, from the fact that while other lines composing the Wabash system, under a smaller interest charge per mile, have not succeeded in paying off their indebtedness, this Ohio division has, under the system of accounting which has prevailed, been entirely relieved of its indebtedness; but this argument ignores the consideration which controlled the action of both the master and the Circuit Court, viz., that the 76 miles comprising the Ohio division, with valuable and expensive terminals in the large and growing city of Toledo, had an earning capacity sufficient to reach the result had.

In our opinion appellant has not sustained the burden which rests upon it of showing the incorrectness of the final determination of the Circuit Court that the underlying mortgages have been fully satisfied by the application of properly ascertained net earnings.

The decree of the Circuit Court is, accordingly, affirmed.