### GOODWIN v. CAMP.

(Circuit Court of Appeals, Sixth Circuit. February 12, 1924.)

No. 3711.

1. **Joint adventures ⬤1—Contract held not one of "joint adventure."**

A contract under which complainant was paid for her services a commission on the gross sales of a business conducted by defendant at his sole expense, regardless of profits or losses, save that uncollectible accounts should be deducted, *held* not one of joint adventure (citing Words and Phrases, First and Second Series, "Joint Adventure").

2. **Joint adventures ⬤1—Contract held not creating joint interests in business, but of employment.**

By a contract between them, defendant, a manufacturer of corsets, was to take up the manufacture of a corset designed by complainant, who was to devote her time to its designing, introduction, and sale, and was to receive in payment a commission on gross sales. It was provided that her name should be registered and used as a trade-mark, to be owned by defendant. *Held*, that the contract did not create a special business in such corset, in which complainant had a proprietary interest, but was one of employment on commissions.

3. **Trade-marks and trade-names and unfair competition ⬤40—Covenants held limited to time contract was in force.**

Complainant contracted to design corsets and garments to be made and sold by defendant under complainant's name as a trade-mark, and on which she was to receive a royalty. The trade-mark was to be the property of defendant, but to be used only on articles designed by complainant so long as she performed her part of the contract. Defendant also agreed not to make and sell competing articles without notice to complainant and payment to her of a commission thereon. *Held*, that such covenants by defendant were limited to the period while the contract was in force, and that on its breach by complainant he was entitled to continue use of the trade-mark.

4. **Trade-marks and trade-names and unfair competition ⬤30—Continued use of name held not misleading.**

The name of complainant was registered and used as a trade-mark on corsets originally designed by her, but made and sold by defendant, whose name also appeared with the trade-mark. *Held*, that the continued use of the trade-mark by defendant when, after several years, complainant ceased to be associated with the business, was not misleading, as representing to the public that the corsets were made under complainant's supervision.

Appeal from the District Court of the United States for the Eastern District of Michigan; John M. Killits, Judge.

Suit in equity by Emma E. Goodwin against Samuel H. Camp. Decree for defendant, and complainant appeals. Affirmed.

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Walter L. Post, of New York City (James D. Andrews, of New York City, and William L. January, of Detroit, Mich., on the brief), for appellant.

Wm. M. Chadbourne, of New York City (W. S. Cobb, of Jackson, Mich., on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. Appellant, a resident of the city of New York, brought suit in equity against appellee, a corset manufacturer in Jackson, Mich., to enforce asserted rights in a certain business of manufacturing and selling corsets, in which appellant claimed to be jointly interested with appellee; the latter asserting that he was the sole owner and proprietor of the business and that appellant was his employé therein. She asked a winding up of the business, an accounting, and an injunction restraining appellee from using the trademark or trade-name "Goodwin" in the business of manufacturing and selling corsets. This appeal is from a final decree dismissing complainant's bill, and enjoining appellant from using the trade-mark or trade-name "Goodwin," and granting other relief as hereinafter stated.

The cause was referred, by consent of parties, to a master in chancery to take the testimony, to make therefrom special findings of facts upon the issues joined, and to report the same, with his conclusions of law thereon, to the court, together with the testimony and all exceptions taken thereto. The master found, in substance, these facts:

Prior to March 24, 1908, complainant had been engaged in cutting and selling ladies' garments and in demonstrating and selling corsets, but was without experience or reputation in designing corsets. At that date defendant was engaged in manufacturing corsets in Jackson, Mich., doing business as S. H. Camp & Co. On the date named the parties made a written agreement providing that S. H. Camp & Co. should take up the manufacture of the line of corsets for which, it was recited, complainant had prepared the designs, and would put it out under her name; she to devote the most of her time to actively pushing the corset, introducing it in new localities and stimulating trade in places where it might previously have been introduced. For this defendant was to pay her a commission of 15 per cent. on all first orders taken by her, or orders coming from such customers during three months succeeding the placing of their first order, or taken and sent in by her on trips over territory in which the garments had already been introduced, and a commission of 5 per cent. on orders received after the expiration of three months, or orders sent in from any source, except from complainant, including those sent in by agents in localities already covered by salesmen. All orders were to be subject to defendant's approval of the credit or financial responsibility of the party ordering. An allowance of approximately 5 per cent. on the gross sales was made for advertising of all kinds. There was express provision that S. H. Camp & Co. were "to secure trade-mark at their expense, right of which shall belong to them." On June 20, 1910, defendant agreed, in writing, to pay complainant a larger com-

mission upon certain classes of orders. Under the original contract, as so modified, and until June 2, 1914, complainant designed corsets, actively assisted in establishing agencies for the sale thereof in various cities, wrote advertisements, traveled about the country obtaining orders for and exploiting the merits of such corsets, managed at different times the New York shop of the business, voluntarily paid one-third of the expense for advertising until January 2, 1914, and in general rendered valuable services "in actively pushing the corset, introducing it in new localities, and stimulating trade in places where it had previously been introduced."

For these services she received the commissions provided for in the contract. During the same period defendant, doing business as S. H. Camp & Co., at Jackson, manufactured the corsets so designed; purchased machinery and materials, and employed, discharged, and paid the help necessary to such manufacture; employed, discharged, directed, and paid traveling representatives throughout the country; made all contracts entered into with agencies and agents selling or handling such corsets; fixed the prices thereof; accepted or rejected at will all orders; collected and disbursed all receipts from sales, and retained all profits thereof remaining after paying all expenses, including commissions to complainant; and in general controlled and directed the business. Immediately after the execution of the contract of 1908 the word "Goodwin," printed in black script letters, as in the signature of complainant, was adopted as a trade-mark and trade-name for the corsets in question, and was so used continuously to the date of the commencement of suit, being affixed by printed label to each corset so made, printed on the stationery used in the business, displayed on windows and signs in the factory and in the different shops and salesrooms, and used in circulars, booklets, and magazine and newspaper advertisements, usually in juxtaposition with the name of S. H. Camp & Co. On November 1, 1910, certificate of registration of that trade-mark was duly issued to defendant upon his application therefor filed December 9, 1909, followed by complainant's consent and permission that defendant "use the autograph 'Goodwin' as a trade-mark on corsets, underwear, and articles of ladies' clothing manufactured by the said [defendant] and * * * register the same as the trade-mark of aforesaid Samuel Higby Camp in the United States patent office."

Until 1914 the parties acted on the assumption and understanding that defendant was the sole owner of the business and of the trade-mark. In the spring of 1914 friction, which had been growing between the parties, increased to such an extent as seriously to threaten the continuance of their business relations. Complainant had been removed by defendant from the management of the New York shop, and considerable ill feeling had been developed between them. Complainant felt insecure concerning the permanency of her connection with the business, and resentful regarding her removal from the New York shop management. As a final result of negotiations between the parties, a contract was made and executed between them at Jackson, Mich., on June 2, 1914, which recited that the parties thereto had since March 24, 1908, and under written agreement of that date,

been "jointly interested in designing and selling corsets and other garments advertised and known to the trade as 'Goodwin,' and the adoption of trade-names and the securing of trade-marks during that period," and further reciting the development and growth of the business to such an extent that it was deemed advisable by the parties that their respective rights, duties and obligations be more specifically defined and fixed to meet the changed conditions—the material provisions being these: Defendant agreed to pay complainant, as royalties, 7 per cent. on the gross aggregate amount of *all sales* of the Goodwin garments manufactured and sold under that agreement so long as complainant "performs her obligations" herein, until such royalties and any commissions equal $12,500 before the end of the current fiscal year, with proviso that if the sales should exceed $250,000 complainant should receive 5 per cent. of the gross sales in excess of the amount last named; also that allowances should be made for returned goods and that losses on accounts should be adjusted by deductions. Complainant agreed that the—

"trade-mark or trade-name 'Goodwin,' and all other trade-marks or trade-names heretofore or hereafter established, adopted, or secured, or used in connection with the Goodwin corset business, shall be and remain the property of [defendant, doing business as S. H. Camp & Co.], to be used, so long as [complainant] performs her covenants herein, only in connection with the manufacture and sale of corsets or other garments designed by [complainant] or persons instructed or authorized by her to design and cut in accordance with the principles used by her, with such improvements as may from time to time be made."

She further agreed to continue her work of designing corsets and other garments, with improvements designed to meet changing styles and conditions, to the end that the manufacture and sale of such garments be profitably carried on, and that "all existing patterns and designs, as well as the patterns and designs hereafter made up, are to become and remain the property of [defendant] except as herein otherwise provided," she "to devote her entire time and to give to the business her undivided attention, in co-operation with [defendant]," and agreeing not to design or aid in designing corsets or other garments for any other persons, firm, or corporation, or interest herself directly or indirectly in any competitive business, so long as defendant shall comply with the terms of the contract. It was mutually agreed that in case complainant, "without justification under this contract," shall refuse to perform her duties thereunder, all right to royalties and commissions thereunder should cease, with special provision for payment of certain reduced percentages in case complainant should become incapacitated for more than six months from performing her active duties; in case of her death her heirs or devisees to receive 2 per cent. for five years. Complainant further agreed that defendant might assign the contract "to a person or persons of responsibility," to a financial extent stated, "or to a corporation with a paid-in capital" of such amount.

Before this last-mentioned contract was signed defendant's attorney stated to complainant that, if she believed the new contract would give her any additional rights in the management of the New York

shop, she ought not to sign it. Shortly after the making of this new contract defendant restored complainant to the management of the New York shop. This new contract failed to improve the situation. The master reports:

"Complainant is a woman of an extremely nervous, sensitive, and high-strung temperament and of strong emotions and opinions. Consequently, when her ideas and policies regarding the conduct of said New York shop did not coincide with those of defendant, clashes between them were inevitable, and the previous friction reappeared and increased steadily during the summer and fall of 1914. Defendant requested, and, upon the failure of complainant to comply with his requests, demanded, that complainant should observe certain rules and regulations governing the keeping of records, and the general conduct of said shop, finally notifying complainant that unless she complied with such regulations he should be obliged to again relieve her from the management of the shop. Complainant did not agree with the wisdom of certain of said regulations, did not recognize the right of defendant to insist upon them, and refused to comply therewith." That thereupon, on November 21, 1914 (following a conference in New York on the previous day, in which each party was represented also by counsel), defendant advised complainant in writing that in view of her refusal to carry out certain of the directions contained in his letter of November 6, 1914, which in his judgment were stated as necessary to the successful conduct of the business, and for the further reason, "as stated to you, that the New York shop is losing money as at present conducted at the rate of approximately $1,000 per month, and so rapidly as to threaten to seriously involve the entire business," he was compelled to relieve her as manager of the New York shop, directing her forthwith to cease to act as such manager and to deliver to a designated person the keys thereof.

Ten days thereafter this suit was begun. The master further reports that:

"The basis and underlying reason for this refusal of complainant to observe the instructions of defendant was her attitude, assumed for the first time after the making of the contract of June 2, 1914, aforesaid, that she had a joint interest in said business, which entitled her to an equal voice in the conduct thereof, at least so far as the New York shop was concerned, and that therefore she was not obliged to observe his instructions in regard to the management thereof, and she had determined, before being removed as manager as aforesaid, not to continue her relations with defendant under said contract, unless he changed his attitude of sole ownership and recognized her right to a share in such ownership."

The master further reports that he found no evidence of any violation of contract by defendant, and that in his opinion the evidence was insufficient to warrant a finding that defendant has sustained damages in any definite sum as a result of complainant's violation of the contract.

The master concluded, as matter of law, that by the terms of the original contract, as construed by the acts and conduct of the parties thereunder, complainant at no time had any right, title, or interest in the business of manufacturing and selling the corsets designed by her, except the right to her commissions or royalties as provided therein. He was further of opinion that by the letter of June 20, 1910, complainant's rights were not enlarged, except as to the amount and computation of commissions, expressing his satisfaction that defendant's allusion in said letter to his feeling that the parties were "together building up the business" was not intended as an agreement or admission that they were joint owners of such business; further, that complainant acquired no right of joint ownership in the business by

the contract of June 2, 1914; also that defendant is the only owner of the registered trade-mark "Goodwin"; that the attitude, acts, and conduct of complainant since the making of the contract of June 2, 1914, to and including the date of commencement of suit, necessarily and intentionally involved a repudiation by her of that contract; that complainant's rights thereafter, including her right to any commission by virtue of the same after December 1, 1914, have therefore been terminated; that complainant is entitled to receive from defendant her commissions under the contract earned during the months of September and October, 1914 (presumably meaning October and November), so far as not already paid to her; that defendant, being the owner of the trade-mark "Goodwin," is entitled to be protected against its use or colorable imitation by complainant, but that the latter, not having agreed to refrain from engaging in the business of designing and selling corsets, etc., after the termination of her contract rights, is entitled to engage in such business and to use her name therein, provided it be not used in a manner intended to mislead purchasers, and that it be clearly made to appear that the goods sold are her own and not those of defendant; that while defendant is not entitled to the trade-mark "Goodwinette," complainant's use of the same would infringe defendant's trade-mark "Goodwin."

Upon hearing by the District Judge on the pleadings and the master's report, the exceptions to the latter were overruled, and decree entered (substantially as recommended by the master) dismissing the bill of complaint; adjudging that complainant was the employé of the defendant under the contract of June 2, 1914; that she has violated that contract and refused to perform it, and that defendant is therefore released from all obligation thereunder; that the business of manufacturing and selling corsets and other garments carried on under the name of S. H. Camp & Co., at times referred to as the Goodwin corset business and otherwise, and all the property and effects connected therewith, belong to the defendant, and that complainant has no interest, joint or otherwise, in the business carried on by defendant, whether relating to the corsets known as "Goodwin" corsets or otherwise; and that defendant is the sole and exclusive owner of the trade-mark and trade-name "Goodwin," and entitled to its sole and exclusive use. Complainant was thereupon perpetually enjoined from using that trade-name, and from making, selling, advertising, etc., any corsets represented to the trade or to the public in a manner intended, calculated, or likely to convey the belief or impression that they are the defendant's product or are "Goodwin" corsets, original Goodwin corsets, or genuine Goodwin corsets, or otherwise, or are similar to or successors to defendant's corsets known as "Goodwin" corsets, and from the use of the word "Goodwinette." Complainant was also awarded recovery for the net amount of moneys due her (and still unpaid) as commissions on goods sold during October and November, 1914.[1]

[1] Since this appeal was taken the net amount of such commissions has been agreed upon by the parties, and has been paid by defendant and accepted by complainant, in full of the accounting reserved in the decree, and without prejudice to either party upon this appeal.

[1] Reversal is asked on the grounds that the relation between the parties was that of joint adventurers in the "Goodwin business"; that the purpose and effect of the final contract of June 2, 1914, was to secure complainant in her joint interest, and to secure to the business the exclusive right to her talents, reputation, and good will so long as it was carried on under the contract; that no breach thereof by complainant has been shown, but that defendant repeatedly violated the agreement, and that he acquired no right to the use of the trade-mark "Goodwin" in connection with a business from which complainant is excluded.

We think it not very important whether the relation between the parties be characterized as a "joint adventure." In a sense it was such, although as generally (perhaps not universally) construed that relation is analogous to a partnership (differing therefrom, principally at least, in being limited in scope, or duration, or both), and thus involving the idea of division of profits or net proceeds. See Words and Phrases, First Series, p. 3814, title "Joint Adventure"; also 2 Words and Phrases, Second Series, p. 1232, same title; Ross v. Willett, 76° Hun, 211, 27 N. Y. Supp. 785; Jones v. Walker, 51 Misc. Rep. 624, 101 N. Y. Supp. 22, 23. A contract of joint adventure "is to be enforced and the rights and liabilities of the parties determined upon the same principles as are applied by courts of equity to partnership transactions." Wilcox v. Pratt, 125 N. Y. 688, 690, 25 N. E. 1091, 1092; Jackson v. Hooper, 76 N.·J. Eq. 185, 74 Atl. 130. Under such construction, the idea of "joint adventure" is here lacking, not because defendant owned the factories and the New York and other offices, and all other tangible assets, and himself paid all expenses of manufacturing and (for the most part) all other expenses of the business, but because appellant was paid as compensation for her services fixed commissions upon the gross sales, without reference to whether the business made a profit or suffered a loss, and thus whether or not there were any net or joint proceeds to divide.

[2] But, apart from this consideration, we think it a mistake to say that the contract concerned merely the transaction of a "Goodwin business," as distinguished from a contract of employment upon commissions, which we think was its dominant characteristic. Previous to this contract complainant had no business which could properly be considered established, except that she was a successful saleswoman, had had considerable experience in designing women's garments, and some little experience in designing corsets. To this extent only, as we construe the record, can there be said to have been a "Goodwin corset."[2] On the other hand, defendant's business was that of manufacturing and selling corsets. We are impressed with the reasonableness of defendant's statement, that his purpose "in naming the corset 'Goodwin'" was to give complainant, "who was to sell the gar-

---

[2] Complainant stated in a letter to defendant July 29, 1911, that "when the business was proposed to me, you wished to use the name 'Goodwin.' It was your choice. I preferred not to have my name attached to a corset, but you had quite made up your mind to it. So it was called the 'Goodwin' corset, even before you knew that I could do the actual work of designing and cutting patterns."

ment, prestige and standing with the trade and enlist her pride and earnest work in selling the corset," although, of course, complainant's prestige and standing with the trade, whether thereby or previously acquired, was a valuable contribution toward the success of the contemplated manufacture and sale of corsets to be designed by her. Presumably this consideration was reflected in the commissions or royalties paid. There was nothing essentially novel in this. We think the language of the original agreement of 1908, "For this[3] we are to pay you" the commissions named, together with the commissions and royalties provision in the later agreement, not overcome by defendant's expressions in correspondence with complainant, such as "I look upon the Goodwin business as being yours as much as mine," "I want to make it a big business for you and I," and "the best interest of the firm."

We find no support for the suggestion that the first contract and what led up to it "will bring a strong impression of a hiring by Mrs. Goodwin of Mr. Camp merely to manufacture specific articles on orders satisfactory to him, he not being obligated to do more than fill orders." We think the fact conclusions reached by the master, including the finding that "during the period stated the parties acted on the assumption and understanding that defendant was the sole owner of the business and of the trade-mark," must be sustained in all material respects, not only because of the rule that the finding of a master, concurred in by the judge, will be accepted on review unless clearly wrong,[4] but because in our opinion these conclusions are well supported by the record, unless to the slight extent noted in this opinion.[5] · We are unable to find in the actions of defendant anything creating an estoppel to deny complainant's claim of a joint interest in the business.[6]

---

[3] These words immediately follow the first paragraph of defendant's letter, which, with its acceptance, evidenced the original contract: "In accordance with our conversation to-day, we will take up the manufacture of the line of corsets for which you have prepared the designs and put it out under your name, you to devote the most of your time to actively pushing the corset, introducing it in new localities, and stimulating trade in places where it may previously have been introduced."

[4] Wabash Ry. Co. v. Compton (C. C. A. 6) 172 Fed. 17, 21, 96 C. C. A. 603, and cases there cited; Western Transit Co. v. Davidson S. S. Co. (C. C. A. 6) 212 Fed. 696, 701, 129 C. C. A. 232.

[5] We think this rule not inapplicable merely because the judge did not "read the entire record," in view of his statement that "we have not availed ourselves of the presumption which obtains favoring the conclusiveness of the master's findings, but we have gone sufficiently into the record to satisfy us of the merits of this controversy independent of the master's opinion."

[6] The contention of estoppel seems to be based largely on "invitations of confidence" asserted to have been made by defendant in permitting complainant to do business with an advertising agency in her own name, as though the business were her own, including a statement to the advertising firm—in discussing a proposed change in handling advertising, etc.—that complainant was the only person interested outside of himself, and that he could not adjust the matter, nor did he wish to, without consulting her; the use of a letter head "The Goodwin Corset," without mentioning the manufacturer's name, together with the use of certain statements before referred to, such as "I want to make this a big business for you and I"—all of which must be

The reasons for the making of this agreement of June 2, 1914, are, for the purposes of this opinion, sufficiently stated (in connection with what is said herein) in the master's opinion as we have summarized it, as is also the history of the relations of the parties following that agreement. We accept the master's conclusion that complainant acquired no right of joint ownership by the contract of June 2, 1914. That conclusion seems especially indicated by the provision therein that existing and future trade-marks, patterns, and designs should be and remain defendant's property, subject to a certain limitation as to the trade-marks and as to the patterns and designs, "except as herein otherwise provided"; the provision that complainant's right to commissions and royalties should cease on her refusal "without justification," etc., to perform her duties under the contract; the provision that no advertising be done "except the same is submitted to and approved by" the defendant; the authority given to defendant to assign the contract; the prohibition against defendant's selling without complainant's consent any corset designed by any one else under her name, or any corset designed by her under any name but that of "Goodwin," so long as [complainant] in good faith performs the conditions of this contract on her part to be performed.

We are also constrained to accept the master's finding that no violation of the contract on defendant's part was shown, as well as his conclusion of the "basic and underlying reason" for complainant's attitude after the contract of June 2, 1914, including her determination not to continue her contract relations unless defendant changed his attitude of sole ownership. We see nothing to criticize in the language of the District Judge cited in the margin.[7]

[3] Passing for the moment the question of defendant's right, after the cancellation of the contract with complainant, to use the trademark or trade-name of "Goodwin," we think the conclusion of fact referred to clearly justified defendant's cancellation of the contract, and authorized him to continue in his own name and for his sole benefit the manufacture and sale of corsets, including the proprietary use of patterns and designs already made by complainant. We think the provision in the second paragraph of the agreement of June 2, 1914, that defendant should not engage in the manufacture of corsets or other garments which came in direct competition with such garments designed

considered in the light of complainant's letter to defendant in July, 1911: "I have never pretended to own the business. I have, when the matter required explanation, claimed to be simply the designer of the goods, the general sales agent of the company, the advertising woman, and the manager of the New York shop," and her reference in December, 1912, to her "honest and conscientious purpose of building your corset business." As we understand the record, it was not until after the making of the agreement of June 2, 1914, that complainant claimed any joint ownership of the business.

7 "One cannot read the correspondence between Mr. Camp and Mrs. Goodwin, illuminated as this correspondence is by extracts from the record which the assiduity of counsel on both sides has brought to our attention in the briefs, without wondering at the amazing patience of Mr. Camp with his employé, for such Mrs. Goodwin was, and the equally amazing indifference of Mrs. Goodwin to her obligation both to serve her employer under the contract as it laid down lines for her service and as well to recognize his right to direct the management of his business."

by complainant, except with notice to her, with agreement, in case of such competing manufacture, to pay complainant 5 per cent. of the gross sums derived from the sale of such other corsets so long as the trade-mark or trade-name "Goodwin" is used in his business or he continues to sell "Goodwin" corsets, especially when considered in connection with the other contract provisions we have stated, must be held limited to the period while the contract was in force. 

We further think the District Court rightly held defendant entitled to continue the use of the trade-mark "Goodwin" on corsets manufactured by him. We do not understand complainant to claim that defendant is advertising or representing his corsets as made by complainant, or that he is doing more than to use the trade-mark "Goodwin" as he had lawfully used it in his own manufacturing for upwards of six years, by virtue of express contract with complainant therefor, purporting in terms to vest in him complete and perpetual ownership thereof, to the registration of which trade-mark in defendant's name complainant had formally assented, and the ownership of which had been reaffirmed to him in the agreement of June 2, 1914.

[4] This case does not involve the proposition that a trade-mark is not the subject of sale independently of the business to which it is appurtenant. Dietz v. Horton (C. C. A. 6) 170 Fed. 870, 871, 96 C. C. A. 41. Nor do we think complainant without power to give defendant the right to use the trade-mark "Goodwin" unassociated with her connection with the business. Defendant originated that trade-mark and used it from the beginning of his relations with complainant, and, as has already appeared, at his suggestion. It thus from the outset indicated the origin of the goods to which it was attached. Presumably, the pecuniary value of the name was at first due to complainant's acquaintance with the trade, and perhaps to an extent to the fact that she designed the articles to which the trade-mark applied. But that could scarcely have been the case later. Presumably the long-continued and progressively increasing use of corsets of defendant's manufacture, bearing the trade-mark in question, had also given the mark itself, when used by defendant, a substantial standing as representing corsets of his manufacture.

But complainant contends that the corsets manufactured by defendant during the life of the contract were represented as designed by her and made under her supervision; that such construction involved her personal skill and physiological knowledge; that corset designing is a constantly changing art, and therefore that the use of the trade-mark misleads the public as to the actual origin of the goods, and so can not be tolerated.[8]

8 Defendant testified that in 1908 he assisted complainant in making patterns, testing them, trying them on persons, and so produced four models in different lengths; that he is able to cut, make, and finish a corset in every detail; that some of the patterns made during her contract relations were not touched for two or three years at a time, others were gone over occasionally; that the last changes were made at various dates in 1912, 1913 and 1914, and that these models can be changed to meet a condition or style without interfering with, changing or disturbing the physiological principles involved in that corset construction.

If the public, without notice to the contrary, has the right to believe that the corsets now being manufactured and sold by defendant under the trade-mark "Goodwin" were made under complainant's supervision, it might well be misled until notified of her nonconnection with defendant's manufacture—a fact by this time doubtless pretty well known to the trade.[9] We are not inclined to think that under the facts of this case the public had the right to believe that corsets manufactured by defendant after November, 1914, were made under complainant's personal supervision. Defendant's letter heads, used at least in and since the spring of 1910, carried the name of "S. H. Camp & Co., manufacturers of Goodwin (under the name of 'Goodwin,' trade-mark) corsets, lingerie, and belts," preceded by a legend, "Address all communications to main office and factory at Jackson, Michigan," followed by the location of the New York, Chicago, and Jackson salesrooms. He used cards reading, on one side, "Goodwin Shop, Camp Building, Jackson, Michigan," and on the other, "Goodwin Shop, operated by S. H. Camp & Co., manufacturers of Goodwin corsets and lingerie," followed by the New York and other addresses. As we understand the record, the advertisements prepared by defendant (aside from using the name of "Goodwin Shop" and referring to "Goodwin corsets," etc., and the trade-mark "Goodwin") did not during the life of the contract purport to be signed by complainant, although she, in connection at least with her management of the New York office, for a time, and until defendant insisted upon its discontinuance, used her name by way of signature as "designer of the Goodwin corset" to statements in advertisements prepared by her, part of the time omitting defendant's trade-name as manufacturer. It appears, however, that complainant's photograph was for a time displayed "in the window at Jackson," and "one was used to illustrate newspaper write-ups," and that she, at least in the earlier years, sent out (apparently from the New York shop) advertising circulars over her own signature. Doubtless the trade largely, if not generally, knew of her personal connection with the designing, although she appears to have had no supervision over the manufacture beyond explaining the designs, etc., to the one in charge of the manufacturing. The following authorities, we think, sustain our conclusion that defendant's mere use of the trade-mark since the termination of the contract would not, under the record in this case, imply a representation that the corsets then being put out were in all details designed by complainant or that they were manufactured under her supervision; that the public has no right to draw such inferences, and thus could not legally be misled thereby. Le Page Co. v. Russia Cement Co. (C. C. A. 1) 51 Fed. 941, 943, 2 C. C. A. 555, 17 L. R. A. 354; Russia Cement Co. v. Le Page, 147 Mass. 206, 17 N. E. 304, 9 Am. St. Rep. 685; Hoxie v. Chaney, 143 Mass. 592, 10 N. E. 713, 58 Am. Rep. 149. And compare Chickering v. Chick-

[9] Defendant testified previous to April 18, 1916 (the date of the master's report), that he had not informed the public that complainant was no longer with him, except where they had first written him.

ering (C. C. A. 7) 215 Fed. 490, 499–500, 131 C. C. A. 538; Knabe v. American Piano Co. (C. C. A. 6) 229 Fed. 23, 29, 143 C. C. A. 325.

Had complainant and defendant been actual partners in the business of manufacturing and selling corsets there could be no doubt of defendant's right to continue the manufacture and sale, under the trade-mark, as successor to the firm upon its lawful termination, by cancellation or otherwise. We think defendant's right no less under the case presented here. This conclusion by no means excludes complainant from doing business under her own name, so long as she does nothing to cause the public to believe, and takes reasonable means to prevent such belief, that her goods are manufactured by defendant or by herself as his successor; but we think her rights are subject to the limitations stated. Chickering v. Chickering, supra, at page 500 (131 C. C. A. 548); Knabe v. American Piano Co., supra, at pages 23, 29, et seq. (143 C. C. A. 331), and cases there cited. We think the final decree did not go beyond the application of this rule.

The decree of the District Court must therefore be affirmed.